```
 1                      UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF FLORIDA
 2
                       CASE NO. 20-CR-20155-FAM-4
 3
     UNITED STATES OF AMERICA,
 4                                       Miami, Florida
                  Plaintiff(s),
 5                                       February 19, 2021
             vs.
 6
     ALEJANDRO BOADA OLIVEROS,
 7
                  Defendant(s).      Pages 1 - 43
 8   -----------------------------------------------------------

 9                        DETENTION HEARING
               TRANSCRIBED FROM DIGITAL AUDIO RECORDING
10           BEFORE THE HONORABLE LAUREN FLEISCHER LOUIS
                   UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
     FOR THE PLAINTIFF(S):  STEPHANIE L. HAUSER, ESQ.
13                          UNITED STATES ATTORNEY'S OFFICE
                            99 NE 4th Street
14                          Miami, FL 33132
                            305-961-9065
15                          stephanie.hauser@usdoj.gov

16

17   FOR THE DEFENDANT(S):  HUMBERTO R. DOMINGUEZ, ESQ.
                            150 W Flagler Street
18                          Miami, FL 33055
                            305-373-6400
19                          bert@hdominguezlaw.com

20

21   TRANSCRIBED BY:        Joanne Mancari, RPR, CRR, CSR
                            Court Reporter
22                          jemancari@gmail.com

23

24

25
```

1          INDEX OF EXAMINATION

2    Examination of:                        Page

3    EDARIA APONTE

4    Cross By Mr. Dominguez . . . . . . . . . . . .16

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Thereupon,

2   the following proceedings were held via Zoom videoconference:

3          THE DEPUTY CLERK:  Calling United States v. Alejandro

4   Oliveros, case No. 20 20155, criminal, Judge Moreno.

5          Counsel, please note your appearances for the record.

6          MS. HAUSER:  Good afternoon, your Honor.  Stephanie

7   Hauser for the United States.

8          THE COURT:  Thank you, Ms. Hauser.

9          MR. DOMINGUEZ:  Good afternoon, actually, your Honor.

10  Thank you.  This is Humberto Dominguez on behalf of Alejandro

11  Boada Oliveros.

12         THE COURT:  Thank you, Mr. Dominguez.

13         Let me just confirm that I have Mr. Boada Oliveros

14  there.  Do you see me, sir?

15         THE DEFENDANT:  Yes, correctly.

16         THE COURT:  Are you following the interpretation of

17  what I'm saying at this hearing?

18         THE DEFENDANT:  That is correct.

19         THE COURT:  OK.  Sir, I have you on the calendar today

20  for your arraignment and your detention hearing.

21         You have the right to be present in court for your

22  arraignment; however, we have a limitation right now on moving

23  prisoners from FDC.  So that I can conduct this hearing today,

24  do I have your consent to continue in the manner that we have

25  started, that is, by video?

1           THE DEFENDANT:  Yes, that is correct.

2           THE COURT:  OK.  Counsel ready?  Do you want to

3   arraign your client first?

4           MR. DOMINGUEZ:  Certainly, Judge.  I did file a

5   permanent appearance.  I don't know if it is on the record yet

6   or not.  It was filed this morning.

7           THE COURT:  OK.  It might not be.  So tell me if that

8   is a permanent appearance for purposes of trial only or would

9   it include an appeal if one was taken.

10          MR. DOMINGUEZ:  It is for trial, Judge.

11          THE COURT:  And have you had a chance to explain that

12  to your client?

13          MR. DOMINGUEZ:  I did not.

14          THE COURT:  OK.  Let me make sure, Mr. Boada Oliveros,

15  that you and I share the same understanding.  I see the notice

16  here.

17          THE DEFENDANT:  OK.

18          THE COURT:  It is my understanding, sir, that you have

19  retained Mr. Dominguez to represent you and that he is going to

20  represent you permanently in this case but through trial only

21  and sentencing.  If you were to take an appeal in this case,

22  Mr. Dominguez would file the notice of appeal, but you would be

23  responsible for obtaining your own counsel to pursue that

24  appeal.

25          Do you understand?  Meaning the court is not going to

1  appoint one.

2          THE DEFENDANT:  Yes.  That is correct.

3          THE COURT:  OK.  Mr. Dominguez, ready when you are.

4          MR. DOMINGUEZ:  So, Judge, we will waive formal

5  reading of the indictment.  We have a copy of the indictment

6  and I have reviewed it with him.  We plead not guilty, request

7  trial by jury and the standard discovery order, as well as the

8  Brady admonition.

9          THE COURT:  The court will accept that not guilty plea

10  and we have entered the standing discovery order.

11          Your case, sir, has been indicted before Judge Moreno,

12  and after today all proceedings will be in front of Judge

13  Moreno.

14          Since this is your counsel's first appearance on the

15  case with you and Ms. Hauser, Ms. Hauser, let me tell you, as

16  required by federal Rule of Procedure 5(f), the United States

17  is ordered to produce all exculpatory evidence to the defendant

18  pursuant to Brady v. Maryland and its progeny.  The government

19  has a duty to disclose any evidence that goes to negating the

20  defendant's guilt, the credibility of a witness, or that would

21  reduce a potential sentence.  The defendant is entitled to this

22  information without a request.  Not making these disclosures in

23  a timely manner may result in sanctions, including exclusion of

24  evidence, adverse jury instructions, dismissal of charges, and

25  contempt proceedings.

```
 1              Do you understand, Ms. Hauser?

 2              MS. HAUSER:  I do, your Honor.

 3              THE COURT:  OK.  Are we ready to proceed with the

 4     detention hearing?

 5              MS. HAUSER:  Yes, your Honor.

 6              THE COURT:  OK.  Basis?

 7              MS. HAUSER:  Risk of flight.

 8              THE COURT:  Statutory basis?

 9              MS. HAUSER:  18 U.S.C. 3142, but more particularly

10     here, your Honor, the government is open to a bond.

11              THE COURT:  I meant what subsection.  Sorry.

12              So the government needs a basis to make that motion

13     under the statute.  It is not a drug case and it is not a gun

14     case, so tell me what the basis is.

15              MS. HAUSER:  The basis, well, here is under

16     3142(c)(1), that an unsecured bond would not be sufficient to

17     reasonably assure the appearance of the person.  I do want to

18     say up front, the government is open to a bond in this case.  I

19     have been in discussions with defense counsel.  However, we

20     have not been able to reach an agreement on a bond that is

21     sufficient to the government here.

22              THE COURT:  OK.  All right.  So your bases for moving

23     are under subsection (f).

24              MS. HAUSER:  Yes.

25              THE COURT:  I assume, unless you tell me differently,
```

1    Ms. Hauser, that you are limited on these charges and on this

2    defendant's record to a 3142(f)(2)(A) or (B), either that he is

3    a serious risk of flight or a serious risk that he will

4    obstruct or attempt to obstruct justice, threaten, injure,

5    intimidate, or attempt to threaten, injure, or intimidate a

6    prospective witness or juror.  That is your burden to even make

7    the motion.

8             MS. HAUSER:  Yes.

9             THE COURT:  I assume, unless you tell me

10   differently --

11            MS. HAUSER:  No, no, that is what we are moving, your

12   Honor.  It is (f)(2)(A).

13            THE COURT:  OK.  It's your intention here to show that

14   he presents a serious risk that he will flee.

15            MS. HAUSER:  Correct.

16            THE COURT:  OK.

17            MS. HAUSER:  May I proceed by proffer?

18            THE COURT:  Yes.

19            MS. HAUSER:  United States Secret Service special

20   agent Edaris Aponte is present, and I would like for her to

21   confirm before I start that she can hear me.  I see her.

22            MS. APONTE:  Yes.

23            MS. HAUSER:  OK.  Great.  Thank you.

24            The defendant, Alejandro Boada, is charged here with

25   one count of conspiracy to commit bank and wire fraud, in

1    violation of Title 18, United States Code, Section 1349, one

2    count of wire fraud, in violation of Title 18, United States

3    Code, 1343, and one count of aggravated identity theft, in

4    violation of Title 18, United States Code, Section 1028(a).

5         His guideline, estimated guideline range if he were to

6    proceed to trial is 46 to 57 months' imprisonment, consecutive

7    to a two-year mandatory sentence on the aggravated identity

8    theft charge.

9         The defendant here participated in a fraudulent

10   mortgage scheme in which the perpetrators used fraudulent

11   passports to impersonate the owners of residential properties

12   to obtain fraudulent multimillion dollar commercial private

13   loans on those properties.  In addition, the perpetrators

14   impersonated the property owners to open bank accounts in the

15   names of the property owners through which the fraudulent loan

16   proceeds flowed.

17        As charged in a superseding indictment, from the

18   summer of 2019 through March of 2020, the defendants were

19   successful in completing four fraudulent loans, for a total of

20   approximately $9.5 million, and attempted a fifth loan for

21   approximately $700,000 in May of 2020.

22        This defendant's role in the scheme was to recruit

23   codefendant Lilia Rosa Morales Moreno to use a fraudulent

24   Venezuelan passport to impersonate an individual with the

25   initials D.J.R.F., who was the real owner of a condominium in

Bal Harbour, and that unit is referred to in the superseding indictment as Bal Harbour Property 2, in order to obtain a $1,050,000 loan on the property in August of 2020.

In addition, this defendant provided fraudulent Venezuelan passports and other fraudulent identification to be used in connection with other properties in this scheme.

On or about August 14 of 2019, according to documents in the loan file, an individual impersonating D.J.R.F., the owner of Bal Harbour Property 2, applied for and received a $1,050,000 loan on the property. The loan documents were purportedly signed by D.J.R.F., and the loan file contained a photocopy of a Venezuelan passport that had the name, date of birth, and cedula number, which is like a Social Security number in Venezuela, that belonged to D.J.R.F. but bore a photograph of codefendant Morales.

Subsequently to the loan closing, the closing agent and his assistant both identified Morales from six-pack photo lineups as the individual who impersonated D.J.R.F. at the loan closing.

On or about August 14 of 2019, a wire for just over $800,000 was sent from the closing agent's escrow account to an account that had been opened in the name of D.J.R.F. at TD Bank. According to TD Bank records, on or about July 25th of 2019, that checking account was opened in the name of D.J.R.F. at TD Bank, the signature card for which included a Venezuelan

1    passport number that matched the number on the fraudulent

2    passport produced at the loan closing in the name of D.J.R.F.

3    So that number really did not belong to D.J.R.F.

4         According to bank records for that bank account, the

5    over $800,000 in fraudulent loan proceeds were dissipated in a

6    matter of weeks, including a wire transfer and a check totaling

7    approximately $123,000 to an individual with the initials

8    D.E.D.M.

9         I do want to note here that law enforcement did

10   interview D.J.R.F. and she advised that she did not authorize

11   this loan or authorize anyone to use her name or any other

12   personal identifying information or to apply for the loan or

13   open the bank account in her name.

14        Turning back to the $123,000 that was transferred of

15   loan proceeds to an individual, different individual with the

16   initials D.E.D.M.  A subsequent search of a cell phone

17   belonging to codefendant Carlos Castaneda revealed messages

18   between Castaneda and this defendant here, Boada, indicating

19   that Boada had control over the account in the name of D.E.D.M.

20   that received fraudulent loan proceeds.

21        On or about May 16 of 2020, Boada sent a copy of a

22   different fake Venezuelan ID, this time in the name of someone

23   with the initials F.F., that bore a photograph of D.E.D.M.  In

24   addition, on or about May 21st of 2020, Boada asked Castaneda

25   to send him money through an account also in the name of

1    D.E.D.M.   In addition, there's evidence that Boada was involved

2    in the attempted fraudulent loan on the Miami Beach property in

3    May of 2020.

4            Also observed on Castaneda's cell phone in or around

5    May of 2020 are messages between Castaneda and Boada in which

6    they discuss opening fraudulent bank accounts in the name of

7    S.L.G, who was the principal of the company that owned the

8    Miami Beach property.   As part of those conversations, Boada

9    provided an address at 8100 Geneva Court to receive a debit

10   card associated with a fraudulent bank account opened in

11   S.L.G's name.

12           I would note that at least two of the proposed fraud

13   signers in this case by the defense reside at the same address.

14           Also as part of those messages --

15           THE COURT:  Ms. Hauser.

16           MS. HAUSER:  Yes.

17           THE COURT:  The same address that was the subject of

18   the fraud or where the defendant resides?  What did you mean by

19   the same address?  You just said I note the two cosigners live

20   at that address.  Which address?

21           MS. HAUSER:  It is 8100 Geneva Court, and that is the

22   address that Boada sent to Castaneda as an available mailing

23   address to receive a debit card.

24           THE COURT:  Thank you.

25           MS. HAUSER:  So it is not where Boada resides.  It is

1    not a target property.

2              THE COURT:  I have it.  Thank you.

3              MS. HAUSER:  OK.  As part of those same messages, on

4    or about May 16 of 2020, Castaneda sent to Boada a copy of a

5    fraudulent Spanish ID in S.L.G's name that bore a photograph of

6    yet another codefendant, Isabelle Batista.

7              In the context of discussing obtaining IDs, Boada sent

8    a copy of that fraudulent Venezuelan ID that I mentioned a few

9    minutes ago in the name of F.F. that bore a photograph of

10   D.E.D.M. as an example of a fake ID that he could obtain for

11   the scheme.  In addition, law enforcement has obtained various

12   evidence that Boada used Morales to engage in various frauds

13   related to the scheme under different assumed identities.

14             As part of Boada's discussions with Castaneda, on or

15   about May 16th of 2020, Boada sent a photograph of Morales to

16   Castaneda, suggesting her as a potential candidate to

17   impersonate S.L.G.  The photograph Boada sent was the same

18   photograph of Morales that was used in the fraudulent D.J.R.F.

19   passport that was used to obtain the loan on the Bal Harbour

20   Property 2.

21             In addition, law enforcement obtained a copy of yet

22   another fraudulent Venezuelan passport with the same photograph

23   of Morales, but this time in the name of someone with the

24   initials M.S.L.  That fraudulent M.S.L. passport was used to

25   open a UPS P.O. Box on or about July 18 of 2019.  A mail cover

1  on that P.O. Box revealed that the P.O. Box was the address

2  used to receive bank statements from various fraudulent bank

3  accounts opened in the names of the owners of Bal Harbour

4  Property 2 as well as Bal Harbour Property 1 and the Pinecrest

5  property.  All of those were properties targeted throughout the

6  course of this fraudulent loan scheme.

7          The fraudulent Venezuelan passport with the same

8  photograph of Morales but in the name of M.S.L. was also used

9  on or about June 19 of 2019 to open a bank account at TD Bank

10 in the name of M.S.L.

11         On or about July 23, 2019, TD Bank surveillance video

12 footage captured this defendant, Boada, depositing a

13 counterfeit Wells Fargo cashier's check into the M.S.L. account

14 at TD Bank.

15         Fast-forwarding in time a little bit to March 7th of

16 2020, Morales was stopped at a TD branch by local law

17 enforcement.

18         During a post-Miranda interview of Morales, law

19 enforcement observed incoming text messages from a phone number

20 associated with Boada, instructing Morales to delete their

21 chats and not to say anything.

22         Then when Morales was arrested on or about February

23 3rd of 2021 in this case, post-Miranda she told law enforcement

24 that she knew Boada from Venezuela and had once couriered a

25 laptop from Venezuela to the U.S. for Boada that she believed

1   contained copies of fraudulent passports.

2           Then when the agents brought Morales to FDC to be

3   taken into custody, while she was waiting for processing, the

4   agents, at Morales' request, let her use the restroom.  When

5   Morales returned from the restroom, she was crying and visibly

6   upset.  She told the agents that she had run into Boada when

7   she was going to the restroom and that he told her not to speak

8   to law enforcement.

9           Based on law enforcement's review of Boada's social

10  media and other surveillance in preparation for his arrest in

11  this case, law enforcement has observed that he works as a boat

12  captain, and as part of that pre-arrest surveillance law

13  enforcement reviewed social media postings from within the last

14  year that showed Boada socializing with various people and in

15  which Boada is not wearing a mask.  I bring that last point up

16  in anticipation of an argument that the defense will be making

17  about Boada's medical condition in the context of COVID.

18          That concludes the proffer.

19          Special agent Edaris Aponte is available for

20  cross-examination.

21          THE COURT:  Mr. Dominguez, do you wish to inquire?

22          MR. DOMINGUEZ:  Yes, your Honor.  If I may proceed.

23          THE COURT:  Well, I am going to swear the agent first.

24          MR. DOMINGUEZ:  Yes, of course.

25          THE DEPUTY CLERK:  Please raise your right hand.

```
 1              THE WITNESS:  Yes, ma'am.

 2              THE DEPUTY CLERK:  Do you solemnly swear or affirm

 3    that the testimony you are about to give will be the truth, the

 4    whole truth, and nothing but the truth, so help you God?

 5              THE WITNESS:  I do.

 6              THE DEPUTY CLERK:  Thank you.

 7              Please state your name.  Can you spell your first and

 8    your last name for the record and tell us where you're

 9    employed.

10              THE WITNESS:  Yes, ma'am.  My first name Edaria,

11    E-D-A-R-I-A.  My last name is Aponte, A-P-O-N-T-E.  I'm a

12    special agent with the United States Secret Service.

13              THE COURT:  Go ahead, Mr. Dominguez.

14              MR. DOMINGUEZ:  Thank you, your Honor.

15     EDARIA APONTE,

16         called as a witness,

17         having been duly sworn, testified as follows:

18    CROSS-EXAMINATION

19    BY MR. DOMINGUEZ:

20    Q   Agent Aponte, a few questions.  You heard the proffer by

21    the government, correct?

22    A   Correct, sir.

23    Q   Is that accurate as to everything that occurred in this

24    case?

25    A   Yes, sir.
```

```
1    Q    Is there anything significant missing from the proffer?

2    A    What do you mean, sir?

3    Q    Well, are there any details that are important that the

4    government didn't mention?

5    A    That I'm aware currently for this case?

6    Q    Yes.

7    A    Or for him?

8    Q    For him.

9    A    For him or this case?

10   Q    Well, for him.

11   A    For him, no.  That I'm aware of, no.

12   Q    Thank you.

13         So I have some questions regarding the August 14th

14   transaction where he is listed.  Are you familiar with the

15   indictment in this case?

16   A    Yes, sir.

17   Q    There is a transaction apparently August 14th where there

18   is a wire communication between Paradise Bank and TD Bank.

19         Are you familiar with those banks?

20   A    Yes, sir.

21   Q    Is Paradise Bank a local Florida bank?

22   A    Paradise Bank?

23   Q    Yes.

24   A    I am not entirely sure where it is actually located, but I

25   think it's here.  I don't know.
```

```
1    Q   So what evidence is there that the -- because it lists that
2    the wire transaction came in from outside of Florida.  What is
3    the evidence that it came in from outside of Florida?
4    A   The Paradise Bank is the escrow account where, you know,
5    when you do the lenders, to put the bank accounts to then give
6    the money.
7    Q   Right.  So when it went from Paradise Bank to TD Bank, how
8    did it travel outside of Florida, if you know?
9    A   The wire transfers, the servers are outside of Florida, the
10   TD Bank servers.
11   Q   And what do you have as evidence of that?
12   A   The subpoena.
13   Q   Do you have the responses to those subpoenas?
14   A   I'm sorry?
15   Q   Do you have the responses to those subpoenas?
16   A   They told us that the servers were out of Florida.
17   Q   They told you or they gave you the evidence of it?
18   A   I believe we have the evidence, yes.
19   Q   And in relation to that transaction, what evidence do you
20   have directly tying Mr. Boada Oliveros to it?
21   A   To that specific one?
22   Q   Yes.
23   A   That's the loan, the amount for the Bal Harbour loan.
24   Q   Yes, it is apparently.  The loan was mentioned for over a
25   million dollars, but yet the transaction is for 829,000 --
```

1  A   That's what I'm saying.  I'm sorry.  That's what I'm

2  saying.  It's one of the Bal Harbour, where the loan was

3  received.

4  Q   Yes.  Yes.

5        What evidence do you have tying him into that

6  transaction?

7  A   We believe that he was the one that helped recruit Lilia

8  Morales.  She was the one that impersonated the victim of that

9  property.

10 Q   How do you know that?

11 A   Based on our -- we did surveillance -- search warrants on

12 the cell phones and then Lilia Morales saying that he does

13 these kind of things in interviews.

14 Q   OK.  So Ms. Morales told you that he recruited her?

15 A   No, that he does things like this, and then based on the

16 phone call with Castaneda, we saw his conversations with

17 Castaneda.

18 Q   How do you know from looking at somebody else's phone that

19 the conversation was with Mr. Boada Oliveros?

20 A   We subpoena the like phone records to make sure that that

21 is Boada's phone.

22 Q   OK.  So that phone was actually in his proper name?

23 A   I believe so, sir.

24 Q   And do you know who was using the phone?

25 A   Personally if he was?

1    Q    Yes.  Exactly.

2    A    No.  Me personally -- it's his phone.

3    Q    Right, but do you know that it is his phone, meaning who

4    saw him using that phone?  What evidence do you have to show

5    that that is actually his phone other than it is in his name?

6    Because other people can have a phone in other people's names.

7    A    Correct, sir.  No.

8    Q    Do you have anybody tying him to that phone?

9    A    No, sir.

10   Q    In relation to -- I think there is also another transaction

11   I think that he is listed in.  Not a transaction but, rather,

12   in Count 14.  Strike that.  No, 14.  It is the identity theft

13   of S.L.G.

14        What evidence do you have tying him into the S.L.G?

15   That is May 16th of 2020, Count 14.

16        Are you familiar with that?

17   A    Is that -- is that what was just stated, that the

18   conversation on the phones?

19   Q    I guess that would be the conversations on the phones, yes.

20   A    With Castaneda?  With his codefendant?

21   Q    Castaneda, Carlos Rafael Castaneda Menendez and Alejandro

22   Boada, yes.

23   A    Correct.

24   Q    So that is basically text messaging between Castaneda and a

25   phone purported to belong to Mr. Boada, right?

1    A    Correct, sir.

2    Q    But you don't have anybody that says that Mr. Boada himself

3    was actually using the phone?

4    A    At that time, no, sir.

5    Q    You are familiar that people sometimes buy phones for other

6    people and have names or phones that belong to somebody else,

7    correct?

8    A    I understand that.

9    Q    And what did you do to verify in fact that that is his

10   phone?

11   A    I'm sorry?

12   Q    What steps did you take to verify that that was actually

13   him utilizing that phone?

14   A    Well, we subpoenaed, like I said, the service provider to

15   see that it's his phone.

16   Q    You know it is in his name, but you don't know if he

17   actually uses that phone, correct?

18   A    The phone, when we arrested him, was also on his person.

19   Q    Where was it on his person?

20   A    On him, on his person, when they arrested him.

21   Q    And do you know if he was using that phone previously other

22   than the day you arrested him?

23   A    That actual phone?

24   Q    Yes, that actual phone.

25   A    No, sir, I am not.

```
 1    Q   Now, what location was he arrested at?

 2    A   At his residence.

 3    Q   Which is -- what is the address?

 4    A   The actual spot was actually in the garage, right before he

 5    was going to his car.

 6    Q   Well, what is the address you're referring to?

 7    A   I'm sorry.  I don't know off the top of my head.

 8    Q   I thought you knew his address.

 9    A   I know it is in Doral.

10    Q   I know, but --

11    A   Sorry.

12    Q   There are people living there.  But anyway, that's fine.

13    I'll move on from there.

14            So now this conspiracy involves a large number of

15    transactions, at least another four other transactions,

16    correct?  Is that correct?

17    A   There's other what?  I'm sorry.

18    Q   That this conspiracy involves a series of other

19    transactions, at least --

20    A   Correct.

21    Q   -- four in total?

22    A   Four properties, correct.  Or four loans.

23    Q   Did you hear me?  I'm sorry.  I couldn't --

24    A   You said there are other transactions?

25            THE COURT:  I feel like you two are having trouble
```

```
 1   hearing each other.
 2              Agent Aponte, are you having trouble hearing
 3   Mr. Dominguez?
 4              THE WITNESS:  I hear some things.  I think he said the
 5   transactions, there are other transactions?
 6              THE COURT:  He is testing mute.
 7              MR. DOMINGUEZ:  I'm sorry.
 8              THE COURT:  All right.  Mr. Dominguez, she didn't hear
 9   the last question.  Can you repeat it, about what you were
10   asking about the transactions.
11              Mr. Dominguez?
12              MR. DOMINGUEZ:  I don't know what --
13              THE COURT:  You're good.  You're just not talking.  We
14   didn't hear the last question.  Do you mind just repeating the
15   last question?
16              MR. DOMINGUEZ:  Judge, I can't hear you at all.
17              THE COURT:  Agent Aponte, do you hear me?
18              THE WITNESS:  I hear you.
19              THE COURT:  OK.
20              MR. DOMINGUEZ:  I don't know what happened here.
21              THE COURT:  We still hear you.  Everyday is an
22   adventure with Zoom.
23              MR. DOMINGUEZ:  I lost my --
24              THE COURT:  You lost -- we still hear you.
25              MR. DOMINGUEZ:  -- my sound.  I'm sorry.  My sound is
```

 1   completely gone.

 2            THE COURT:  Now you are on mute.  Now you are off

 3   mute.

 4            MR. DOMINGUEZ:  No.

 5            A VOICE:  Maybe try a little closer to the mic.

 6            THE COURT:  Tony, apparently he doesn't hear us.  We

 7   hear him.  He doesn't hear us, is the problem.

 8            MR. DOMINGUEZ:  Sorry, Judge.  I don't know why, but I

 9   have completely lost the sound on this.

10            THE COURT:  OK.

11            A VOICE:  It is either his volume maybe.

12            THE COURT:  Spontaneously, though, because he wasn't

13   touching the computer when he suddenly lost us.

14            MS. HAUSER:  Maybe he picked up a bluetooth device?

15            THE COURT:  Yes, but we can't communicate with him

16   because he can't hear us.  I tried telling him that in the

17   chat, but he is not seeing it.

18            A VOICE:  Send him a message maybe.

19            THE COURT:  I tried.

20            Who has a cell phone?  Go ahead and text him and see

21   maybe if he's got the bluetooth device going on.

22            MR. DOMINGUEZ:  Let me try to come back.

23            MS. RAMOS:  Your Honor, I am the paralegal for

24   Mr. Dominguez.  I will call him to see what is going on.

25            THE COURT:  Tony, do it again.  I think he dropped,

1    actually.  Reconnect.  I think that is what he is trying, Tony.

2         A VOICE:  OK.

3         THE COURT:  He dropped.

4         MS. RAMOS:  Your Honor, my name is Leila Ramos.  I am

5    the paralegal for Mr. Humberto Dominguez.  I am going to try

6    his cell and ask him to reconnect.

7         THE COURT:  Thank you.

8         MS. RAMOS:  You're welcome.

9         (Pause)

10        MS. RAMOS:  Excuse me, your Honor.  Mr. Dominguez is

11   dialing back in.  He had some issues with his system.

12        There he is.

13        THE COURT:  Mr. Dominguez, do you hear us now?

14        MR. DOMINGUEZ:  Judge.

15        THE COURT:  Do you hear us now?

16        MR. DOMINGUEZ:  I still can't hear.  I don't know what

17   is going on.

18        THE COURT:  OK.  Hopefully you will get this message

19   through your paralegal.  Our last bank here is that he can dial

20   in with his cell phone, but one way or another I have to

21   conclude this hearing.  We have about two minutes before I am

22   going to roll this into the afternoon.

23        MR. DOMINGUEZ:  I have the dial-in number, but my

24   thing completely went out.  OK.  It is fine.  I will call in.

25        MS. RAMOS:  He is going to be dialing in.

```
 1              THE COURT:  Thank you.

 2              (Pause)

 3              MS. RAMOS:  Can you provide us the dial-in number,

 4     Tony, please?  Thank you.

 5              A VOICE:  Give me a second.  Let me get the dial-in

 6     number.

 7              THE COURT:  646-828, is it 7666?

 8              Alisha, is that right?  Is that the last four?

 9              A VOICE:  Sounds right.

10              THE DEPUTY CLERK:  828-7666.

11              A VOICE:  828-7666, yes.

12              THE COURT:  So, Mr. Dominguez, I'm calling a

13     ten-minute warning on this hearing, after which time it is

14     going to have to be continued to another day.

15              MR. DOMINGUEZ:  Lelia, I don't have the number.

16              THE COURT:  646-828-7666.  I am going to try to put

17     that in the chat.

18              (Pause)

19              MR. DOMINGUEZ:  I need the meeting ID, Judge.  I'm

20     calling in, but I don't have the meeting ID number.

21              THE COURT:  Alisha.

22              A VOICE:  The meeting ID number is 1617375853.

23     1617375853.

24              THE COURT:  Wait.  Humberto, if you're hearing us,

25     then what is the problem?  OK.  That doesn't make sense.
```

1              A VOICE:  Sorry.  My bad.

2              THE COURT:  He repeated back what you said so I just

3    don't understand what is going on.

4              A VOICE:  I'm a little confused.

5              I think his paralegal was communicating throughout the

6    call.  I will write it down and put it on the screen.  Give me

7    a second.

8              MR. DOMINGUEZ:  Leila, the only way it is going to be

9    is if you do it for me.  This is not working.

10             MS. RAMOS:  Your Honor, I am going to call for him and

11   then I am going to transfer the call to him.  Just one moment.

12             (Pause)

13             MR. DOMINGUEZ:  Hello?

14             THE COURT:  Mr. Dominguez, do you hear us?

15             MR. DOMINGUEZ:  Yes, finally.

16             THE COURT:  OK.  Here is the thing, though.  Your

17   computer, if you have the speakers on, we will get the feedback

18   through your telephone.  So can you please either disconnect

19   from your computer or turn the speakers completely off so that

20   we only hear you through your phone.

21             Can you do that?

22             Mr. Dominguez, come back.  Mr. Dominguez.

23             A VOICE:  Judge, he's connected.  I see his tile, but

24   that is the one where he can't see us, correct?

25             THE COURT:  I am at a loss, Tony.  I don't know what

1    is happening, actually.

2              MR. DOMINGUEZ:  I can hear you perfectly, Judge.

3              THE COURT:  OK.  Mr. Dominguez, if you can hear me,

4    hear this.  I am going to break.  So you have a choice here.  I

5    am only waiting to find out if you are on the precipice of

6    concluding this cross-examination, in which case I will allow

7    you those last couple of questions; otherwise, this hearing has

8    to be continued.  We have seven more detention hearings and

9    initial appearances this afternoon and I cannot hold everybody

10   else.

11             What would you like to do?

12             MR. DOMINGUEZ:  I am done, Judge.

13             THE COURT:  OK.  I suspected you might be.  I will

14   hear argument.

15             MR. DOMINGUEZ:  Yes.

16             THE COURT:  OK.  Let me try to do it this way because,

17   again, it is my intention to try to break.  I have got at least

18   one court personnel who has to have a break between these two

19   proceedings.

20             MR. DOMINGUEZ:  Sure.

21             THE COURT:  What I'd like to hear, because,

22   Ms. Hauser, I think I heard you say about a half hour ago that

23   you were open to a bond but hadn't seen a package that worked

24   for you.  So let me hear first what Mr. Dominguez is offering

25   and then I am going to -- Mr. Dominguez, without argument.  Let

1    me start with the facts, right.  You tell me what you are

2    proposing.  Let me have Ms. Hauser tell me why that doesn't

3    work for her.  Then I will go back to you to address

4    Ms. Hauser's concerns and we will figure out from there.  OK.

5            MR. DOMINGUEZ:  Yes, Judge.  Thank you.

6            THE COURT:  OK.

7            MR. DOMINGUEZ:  So a couple of things.  The proposal

8    involves, I'm trying to get a personal surety bond for him or a

9    low 10 percent bond.  I don't have people with properties, but

10   I have 14 people who are willing to sign for him.  They are all

11   employed.  I have, in fact, an exhibit.  The government has

12   this list of 14 people.  Namely, Giuseppe Novielli, which is a

13   business owner who is willing to sign, and a whole series of

14   others.  I can post these if you want on a share screen.  My

15   paralegal is on so she can show the court all the people that

16   are willing to sign on his behalf.

17           THE COURT:  I'm not sure we should get fancy with the

18   technology right now.  Let's talk facts.

19           So you've got 14 employed cosigners that you're

20   willing to advance --

21           MR. DOMINGUEZ:  Yes.

22           THE COURT:  -- and that you've shared with Ms. Hauser?

23           MR. DOMINGUEZ:  Yes, I have, and she has those.

24           THE COURT:  OK.  Are there any other special

25   conditions that you have advanced to Ms. Hauser?

```
1              MR. DOMINGUEZ:  The other thing is that he had
2    recently a surgery last year.  He had a mass removed from his
3    lung.  Ms. Hauser has this.  I guess that is why they went to
4    dig up that he didn't have a mask on or whatever on a boat,
5    which I'm not sure how that is relevant.
6              THE COURT:  No argument yet.  Just tell me the
7    conditions.
8              MR. DOMINGUEZ:  He needs followup treatment for that.
9    I think the fact that he had that surgery also puts him
10   susceptible to COVID, if he gets it, because he has
11   hypertension plus he had a lung mass removed, which is benign
12   luckily, but still requires additional followup care.
13             THE COURT:  But what condition does this go to?  Are
14   you saying house arrest with allowances?  Where are we going?
15             MR. DOMINGUEZ:  Yes, Judge.  If you put him on house
16   arrest and you allow him to obviously seek medical treatment in
17   the meantime, and then maybe the wife -- he has a 7 month old
18   with Rosa Novielli -- have her sign and then have her brother
19   Giuseppe Novielli sign, if that is acceptable, or any of these
20   other 14 people that the government is satisfied with sign.
21             THE COURT:  OK.  OK.  So as I understand it, the
22   advanced package is either a personal surety in combination,
23   perhaps, with a low percentage and a variety of cosigners, two
24   of whom I understand, Ms. Hauser, I anticipate at least your
25   argument is that at a minimum they allowed their residence to
```

1    be advanced as addresses for part of the fraud.  That leaves

2    12.  Tell me your issue or what it is that you think is

3    necessary in a bond.

4         MS. HAUSER:  Generally speaking, I'm looking for some

5    sort of actual security for the bond.  So whether that is

6    cosigners on a personal surety bond who actually have assets,

7    are liquid, have equity in property coupled with a low

8    percentage bond.

9         Other defendants in this case, including Mr. Gonzalez,

10   who you saw a couple of days ago, have bonds that are $250,000

11   personal surety bond with cosigners who have equity, plus a

12   $150,000 10 percent Nebbia condition.  That is a bond that

13   numerous defendants in this case have and I think it would be

14   reasonable here.

15        My concern with the particular cosigners that defense

16   has proposed are that, from what I can tell on this list, and I

17   appreciate a lot of hard work went into this, none of these

18   people own property, and while most of them do seem to be

19   employed, I think we would need many of them to sign onto the

20   personal surety bond to even come close to getting up to a

21   $250,000 amount to make this actually a meaningful secured

22   bond.

23        To the extent that we are going to use some folks on

24   this list, I will have some followup questions for a number of

25   them to -- a few of them we couldn't confirm actual addresses

1    on, and a number of them, depending on what their date of birth

2    is, which is not included, may or may not have criminal

3    histories.

4         So I think there are a subset of this list that would

5    be acceptable to us in combination for the personal surety

6    component, but I am still asking for 150,000 10 percent with

7    Nebbia on top of that.

8         MR. DOMINGUEZ:  I will tell the court that all these

9    people are available.  We made sure that they were available

10   for today's hearing.  So if they want, they can ask -- if you

11   are going to take a break, we can have it done during the

12   break.

13        THE COURT:  A break for the purposes of talking with

14   Ms. Hauser?

15        MR. DOMINGUEZ:  I guess, and she could colloquy any of

16   these witnesses or people that she wants.

17        THE COURT:  OK.  I will tell you, I think that is an

18   awfully good idea.  I think that it is going to make things

19   much more efficient.

20        Ms. Hauser, I will tell you a couple of things.

21        The absence of real property by the cosigners is not

22   going to be determinative.  I understand the value, obviously,

23   of having a property to secure the bond, but every defendant

24   comes here and stands on his own assets, his own alleged

25   conduct on the offenses, his own criminal history.  So a bond

1    for one defendant in the case is not the same bond on a

2    different defendant, same case.  That is just not under the

3    3142 factors how I make the assessment.

4         I understand that the fraud involved a significant

5    amount of loss, and so that factor is the same for all of the

6    codefendants.  But for Mr. Boada Oliveros, if we can set

7    conditions, then we are going to set conditions that are no

8    more onerous than that which is necessary to reasonably assure

9    his appearance here, and it is going to be based on his wealth

10   and his cosigners' wealth.

11        I do encourage you, and it sounds like you are both

12   offering, because I heard you, Ms. Hauser, say that you wanted

13   to ask questions, Mr. Dominguez is making them available, to

14   talk offline.  We are going to take a recess in the proceeding.

15        The difficulty that I have is whether or not I am

16   going to be able to get Mr. Boada Oliveros back in the

17   afternoon session.  I would like to at least propose this, and

18   I understand that you both might say no, and I'm OK with that

19   because then I won't try to do it.  But my suggestion here,

20   giving you both the benefit of the doubt that you are able to

21   figure out cosigners sufficient and come back here with an

22   advanced bond, I am going to give him the advisement as though

23   he got a bond so that I don't have to bring him back.

24   Unfortunately, that means that I am going to ask him -- and,

25   Mr. Dominguez, this may be where you say no, and that is OK.  I

1    will figure it out if I have to.

2          If we conclude the hearing and it does not result in a

3    bond, it means that I am going to ask him to waive his presence

4    at the conclusion of this hearing should it result in a

5    detention hearing.  He has been here for the evidence and he

6    has been here for the predominant argument.  For a matter of

7    just practicality, should the presentation not result in the

8    entering of a bond, I would like the ability to not have SHU

9    bring him back so he can go get lunch.

10          What say you, Mr. Dominguez?

11          MR. DOMINGUEZ:  No, Judge, I will agree with that.  I

12    don't have any problem with that.  I know that it will work

13    out.  If it doesn't work out, I will waive his presence.

14          THE COURT:  I am trying to make sure that all seven of

15    my remaining defendants still get their hearings and that we

16    are as practical as we can be without intruding on Mr. Boada's

17    rights.

18          Mr. Boada, I am going to conclude this hearing after

19    we take a recess and your attorney and the prosecutor have a

20    chance to talk in more fulsome detail offline about what a

21    potential bond is.  There is the possibility that they reach an

22    agreement and a bond is entered.

23          Should a bond be entered, let me tell you now that

24    separate offenses are established for the knowing failure of a

25    defendant to appear before a court as required by the

1    conditions of release and for the commission of a crime while

2    on pretrial release.  Any terms of imprisonment imposed

3    pursuant to either provision of the law is consecutive to the

4    sentence of imprisonment for any other offense.

5           Any violation of the conditions of your release may

6    result in the immediate issuance of a warrant for your arrest,

7    prosecution for contempt of court, revocation of release, and

8    forfeiture of any bond and collateral that has been posted.

9           I want you to understand specifically here, Mr. Boada,

10   that a bond in this case might require collateral being posted

11   by someone you love.  If you fail to show up for court as you

12   are required and I revoke your bond, whoever has signed for you

13   will be out whatever amount of money they have committed on

14   your behalf.

15          Do you understand that would be the consequence of you

16   not showing up for court if I let you out on bond?

17          THE DEFENDANT:  Yes.  That is correct.

18          THE COURT:  OK.  Mr. Boada, do you consent to me

19   concluding this hearing after the break without your presence

20   with just your counsel and your people on the hearing?

21          THE DEFENDANT:  Yes.

22          THE COURT:  OK.  Everybody else who has appeared as a

23   potential cosigner, I do want you back on at least if -- if

24   Mr. Dominguez tells you to be back on, meaning if it is someone

25   who Mr. Dominguez is advancing as a cosigner, I'm going to want

1   to talk to you after the break.  If you need an interpreter,

2   make sure that you have one.

3              Ms. Hauser, I appreciate your willingness to use the

4   lunch hour to speak to Mr. Dominguez.  I will do the best that

5   I can to get you back out of here at 1:30 when we resume.  OK.

6              MS. HAUSER:  Thank you.

7              THE COURT:  Between now and then the court will be in

8   recess.  We are going to take a 30-minute break.  So we will

9   see you at 1:35.

10             MR. DOMINGUEZ:  Thank you.

11             THE COURT:  OK.  Thank you, all.

12             (Recess)

13             THE COURT:  Recalling 20 20155, criminal, Moreno.

14             I know it was a scant 30 minutes, but how did we do?

15             MS. HAUSER:  We have an agreement, your Honor.

16             THE COURT:  Ms. Hauser, there are so many things I

17  want to say right now, but I will just say thank you.  It's

18  Friday.

19             OK.  Tell me what that agreement is, Ms. Hauser.

20             MS. HAUSER:  We are going to do a $250,000 personal

21  surety bond with four cosigners, and I can give you those

22  names, and I believe they are all present on the Zoom to the

23  extent you want to tell them what exactly it is they are

24  signing up for.

25             THE COURT:  OK.  I appreciate that.  I am sure

1  pretrial would also like to have those names.  If you would say

2  them nice and slow, either you or Mr. Dominguez will be fine.

3           MS. HAUSER:  Sure.  They are Rosa Novielis, which is

4  N-O-V-I-E-L-I-S.

5           THE COURT:  OK.

6           MS. HAUSER:  She is in the Pretrial Services report.

7  That is the defendant's partner.

8           Augusto Patino.  A-U-G-U-S-T-O, P-A-T-I-N-O.

9           THE COURT:  OK.

10          MS. HAUSER:  Alexandra Martinez.  Martinez with a Z.

11 The rest is common spelling.

12          And Giuseppe Novielli.  G-I-U-S-E-P-P-E,

13 N-O-V-I-E-L-L-I.

14          THE COURT:  OK.

15          MR. DOMINGUEZ:  That is correct, Judge.

16          THE COURT:  Before I address my cosigners, Ms. Hauser,

17 tell me about special conditions.

18          MS. HAUSER:  Yes, your Honor.  The special conditions

19 are:  Surrender all travel documents and do not obtain new

20 ones, of course; report to Pretrial Services as directed;

21 maintain or seek full-time employment but none that involves

22 personal identifying information, credit card numbers, the

23 like; no contact with defendants named in the superseding

24 indictment except through counsel; no firearms; no visits to

25 any transportation establishments.

```
 1                    In addition to that --

 2               THE COURT:  Right, including sea marinas.

 3               MS. HAUSER:  Including marinas, and no travel on

 4     boats.

 5               MR. DOMINGUEZ:  So, in essence, he cannot work, we

 6     agreed, as a boat captain for the time being.

 7               THE COURT:  Respectfully, Mr. Dominguez, I happen to

 8     notice his criminal history seems to have what we might call

 9     habitual offender in the manatee zone, so yes.  Yes.  Let's

10     keep him off the high seas for now.

11               MR. DOMINGUEZ:  Yes, your Honor.

12               MS. HAUSER:  We have also agreed to home confinement

13     with GPS monitoring with the standard allowances for medical,

14     court, attorney, and employment.

15               THE COURT:  OK.  To be paid for by the defendant?

16               MS. HAUSER:  Yes.

17               THE COURT:  OK.  Mr. Dominguez, your probation officer

18     will tell you this in more detail than I will, but if he is

19     going to be seeking employment other than what he is doing now,

20     he needs to clear with his probation officer going out for the

21     interviews and otherwise seeking it.  He will have that leave,

22     but he has to have pre-approval from his officer.

23               OK.  So I am going to repeat it back.

24               A $250,000 personal surety bond to be cosigned by the

25     four cosigners Ms. Hauser's announced; surrender any passports,
```

travel documents, not obtain any new ones; report to Pretrial

Services as directed; maintain or seek full-time employment

that does not involve either PII or use of a boat; no firearms;

no transportation establishments, including the marinas, and

home confinement, GPS monitoring paid for by the defendant with

allowances to include medical needs, court appearances,

attorney visits, and employment.

MS. HAUSER:  And no contact with codefendants who are

all listed and named in the superseding indictment except

through counsel.

THE COURT:  OK.  Now, Ms. Hauser, you know when I

require that condition, I require my AUSA to put it in writing,

the list of names to defense counsel, to the probation officer.

I know you are telling me it is the people named in the

indictment, but that is still something that I require so that

there is never the opportunity to argue we didn't know who you

meant.  OK.

MS. HAUSER:  Yes.

THE COURT:  So please provide that.

MS. HAUSER:  To the probation officer in the Pretrial

Services report or the one who is present here today?

THE COURT:  The one he is going to be assigned to,

which you will know from Mr. Dominguez or officer Prospere can

tell you, but it is the one who supervises him that matters.

OK.  So I am going to address all four of my cosigners

1  together, but Ms. Novielli, I am going to ask you to take

2  yourself off mute because you and I are going to have a little

3  bit of an exchange here.  So I need Mr. Patino, Ms. Martinez,

4  Ms. or Mr. Novielli -- I'm not sure -- go ahead and turn your

5  cameras on, take yourselves off mute, make yourselves known to

6  me, please.

7           Did we by any chance lose them?  There is

8  Ms. Martinez.  Thank you.  I think I saw Ms. -- OK.  That is

9  Mr. Patino.  I thought I saw Ms. Novielli a second ago.

10           MR. DOMINGUEZ:  She is on, Judge.  I see her.

11           THE COURT:  I saw her come on and then drop -- well, I

12  saw her camera and then go away.  There you are.

13           All right.  Let me make sure, and I know we had

14  Giuseppe like all morning.

15           MR. DOMINGUEZ:  Yes.

16           THE COURT:  OK.  All right.  I want to make sure that

17  you hear from me, and I know that you all have been present at

18  this hearing, you've listened to the proffer of evidence,

19  you've heard the argument by the government counsel, who took

20  the position here and sought detention for Mr. Boada Oliveros.

21  So I know you understand that the offense here alleged is

22  serious and it went on for a lengthy period of time, and

23  nonetheless, it is my understanding that each of you is willing

24  to cosign on a bond in the amount of $250,000.

25           Let me make sure that you understand the commitment

1    that you are undertaking.  I am going to speak to all of you

2    together at the same time and then take yourselves off mute so

3    I can hear you tell me that you're agreeing to this commitment.

4         If Mr. Boada Oliveros fails to appear as he is

5    required, he doesn't show up for a court proceeding, he flees

6    the district, he absconds altogether or just misses his next

7    court appointment, any way around it, I will be told.  I have

8    had a hearing.  I'm setting this bond.  It will come back to

9    me.  If I find out that he violated the conditions of his bond,

10   I may revoke that bond.  If I do and you've cosigned on this

11   bond, do you understand the government can look to you in equal

12   measure, each and any one of you, for up to $250,000 to satisfy

13   the amount that it required the government to go after and find

14   Mr. Boada?

15        Do you understand that, Ms. Martinez?

16        MS. MARTINEZ:  Yes.

17        THE COURT:  Do you understand that, Mr. Patino?

18        MR. PATINO:  Yes.

19        THE COURT:  Ms. Novielli?  I'm asking Ms. Novielli.

20        MS. NOVIELLI:  Yes.

21        MR. PATINO:  Yes.

22        THE COURT:  OK.  I am going to ask you again one at a

23   time.  Are each of you so confident in Mr. Boada that you are

24   willing to undertake this commitment?

25        Ms. Martinez.

```
 1              MS. MARTINEZ:  Yes.

 2              THE COURT:  Mr. Patino?

 3              MR. PATINO:  Yes.

 4              THE COURT:  And Ms. Novielli.

 5              MS. NOVIELLI:  Yes.

 6              THE COURT:  Ms. Novielli, he is going to be residing

 7    there with you in your home, right?

 8              MS. NOVIELLI:  Yes.

 9              THE COURT:  You understand he is going to be on home

10    detention.  He will be there all the time.  You understand?

11              MS. NOVIELLI:  Yes.

12              THE COURT:  You are agreeing to this?

13              MS. NOVIELLI:  Yes.

14              THE COURT:  OK.  All right.  Ms. Hauser, it is now

15    2:00 on a Friday.  Do you have any objection to giving defense

16    counsel until middle of next week to obtain the signatures?

17              MS. HAUSER:  That's fine, your Honor, as long as his

18    ankle monitor is put on today.

19              THE COURT:  As soon as he is released, he will be sent

20    upstairs.  Officer Prospere, if he is released before the

21    lockdown, he should be OK?  I see you nodding.

22              OFFICER PROSPERE:  Yes, your Honor.  If you can

23    actually have him to call our intake number instead of

24    physically reporting, I can provide that to defense counsel.

25              MR. DOMINGUEZ:  Yes.
```

```
 1              OFFICER PROSPERE:  The number is 305 --

 2              MR. DOMINGUEZ:  305.

 3              OFFICER PROSPERE:  523.

 4              MR. DOMINGUEZ:  523.

 5              OFFICER PROSPERE:  54.

 6              MR. DOMINGUEZ:  54.

 7              OFFICER PROSPERE:  03.

 8              MR. DOMINGUEZ:  03.

 9              OFFICER PROSPERE:  Yes.

10              MR. DOMINGUEZ:  523-5403.

11              OFFICER PROSPERE:  Yes.  If he can contact that number

12     immediately upon release.  If he released after 5:00, he can

13     call on Monday morning at 8:30.

14              MR. DOMINGUEZ:  OK.  Perfect.

15              OFFICER PROSPERE:  Thank you.

16              MR. DOMINGUEZ:  Thank you.

17              THE COURT:  OK.  We have already arraigned, and so

18     that concludes our proceeding for Mr. Boada?

19              MR. DOMINGUEZ:  Yes, your Honor.  Thank you.  I'm

20     exhausted.

21              THE COURT:  As I'm sure is Ms. Hauser, to whom I am

22     grateful for working incredibly hard on this case, and I thank

23     you.

24              OK.  You are all who have appeared here on that

25     hearing, you are all excused.  You are also welcome to stay.
```

1    If you stay, please do me a favor and just turn on your camera

2    and stay on mute.  Thank you, all.

3              OFFICER PROSPERE:  Your Honor, one more thing.  I'm

4    sorry.  If I can get a contact number for the defendant as

5    well.

6              THE COURT:  OK.  Ms. Novielli, that might be to you.

7    Can you provide us with a contact phone number?

8              MS. NOVIELLI:  All right.

9              MS. HAUSER:  All right.  We have his phone.

10             MR. DOMINGUEZ:  We have it.  It was 786-916-4715.

11             OFFICER PROSPERE:  OK.  786-916-4715.

12             MR. DOMINGUEZ:  Yes.  That's to reach her because they

13   have his phone so you can reach him.

14             THE DEPUTY CLERK:  Excuse me.  Correction.

15   786-916-4705.

16             THE COURT:  Perfect.  Thank you.  OK.

17             (Adjourned)

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


August 4, 2021            s/ Joanne Mancari
                          Joanne Mancari, RPR, CRR, CSR
                          Court Reporter
                          jemancari@gmail.com